UNITED STATES v. GREENE et al.

(District Court, S. D. Georgia, E. D. February 17, 1902.)

1. CONSPIRACY—INDICTMENT—PLEA IN ABATEMENT—NATURE OF PLEA.

A plea in abatement to annul an indictment of a grand jury, being dilatory, and not favored by the courts, must conform with strict exactness to the requirements as to form, and contain all essential averments, pleaded with accuracy.

2. SAME—IRREGULARITY IN DRAWING GRAND JURY—JUDICIAL NOTICE.

The court, in considering a plea in abatement to an indictment for an omission of the clerk in drawing the grand jury, will take judicial notice of its record relative to the duty which it is claimed the clerk failed to perform.

3. SAME—SUFFICIENCY OF PLEA—PERFORMANCE OF CLERK'S DUTY BY DEPUTY.

A plea in abatement to an indictment averring that the clerk did not place the names of the grand jurors in the box, but that they were placed therein by the jury commissioner and a deputy clerk, without mentioning the deputy's name, or that his action was not done in the clerk's presence, nor alleging that the deputy and commissioner were

of the same political faith, that either was moved by improper motives, or that incompetent or partial jurors were selected, is insufficient.

**4. SAME—MANNER OF PLACING JURORS IN BOX.**

Where jurors were lawfully chosen by jury commissioners of opposing political faiths, it is of no moment that their names were placed in the jury box by the handfuls, instead of alternately by the clerk and by the commissioner.

**5. SAME—CUSTODY OF JURY BOX.**

An indictment will not be quashed on the ground that the jury box was not kept continuously in the clerk's custody, but was delivered by him to strangers, thus giving an opportunity to tamper with the jury box, where it has been the practice, when necessary at the official residence of the judge to draw a jury for another division of the district, to issue a suitable order to the clerk to transmit the jury boxes by a reliable express company, and that was done in the instance referred to in the plea.

**6. SAME—PUBLIC DRAWING—JUDICIAL NOTICE.**

The court will take judicial notice that a grand jury was publicly drawn in the presence of the officials required to be present.

**7. SAME—VENIRE FACIAS—ISSUANCE.**

An indictment will not be quashed on the ground that no venire facias was issued by the clerk, nor filed in the clerk's office for the Eastern division of the Southern district of Georgia, until after the persons whose names were drawn had been summoned, where it is not denied that a venire facias was issued by a deputy clerk of the court having his residence in the Western division.

**8. SAME—INSTRUCTIONS TO JURORS.**

A plea in abatement to an indictment that instructions were given by "those in authority" that the officers serving a grand jury summons should keep secret the names of persons drawn, and enjoin on those summoned the necessity of keeping secret that they had been summoned to serve as a grand jury, is insufficient, where it is not alleged who "those in authority were," and no such instructions were issued by the court.

**9. SAME—NUMBER OF NAMES IN BOXES.**

Where the district court jury box and the circuit court box at the time of the drawing of a grand jury contain exceeding 300 names, and the court directs the jury drawn from the "jury boxes," the indictment cannot be quashed on the ground that the jury box from which the jury were drawn contained less than 300 names, for, though the particular jury was drawn from one of the boxes, all of the names in both boxes may be regarded as the jury body from which the grand jury were selected.

**10. SAME—DRAWING FROM PARTICULAR COUNTIES.**

Under Rev. St. § 802, requiring that jurors shall be returned from such parts of the district as the court shall direct so as to be most favorable to an impartial trial, the fact that the court directs that grand jurors be drawn from particular counties does not disqualify other jurors from other counties, whose names are in the jury box.

**11. SAME—IMPARTIALITY OF JURORS.**

An indictment for conspiracy to defraud the government of money appropriated for harbor improvements will not be quashed on the ground that grand jurors from counties where the improvements were located, and who were peculiarly qualified to act because of familiarity with such improvements, were excluded from the jury box, where such alleged conspiracy was notorious in such counties, and the court was endeavoring to secure an impartial jury.

**12. SAME—WAIVER OF PLEA.**

Defendants under indictment for conspiracy to defraud the government waive their right to plead in abatement to the indictment for alleged irregularity in the drawing of the grand jury where they, by unnecessarily resisting the processes of the court, and resorting to dila-

tory proceedings in another state to prevent being brought before the court, have delayed the trial for more than two years before appearing to present their plea.

13. SAME—ADVICE OF COUNSEL.

In such case it is of no avail to the defendants that they were advised by their counsel that they could not be removed to Georgia for trial, and were under bond to the courts in New York for appearance in proceedings instituted by them to prevent their removal.

## Indictment for Conspiracy.

The parties arraigned before the court are under indictment with Michael A. Connolly and Oberlin M. Carter for the offense of an alleged conspiracy to defraud the United States of America of large sums of money appropriated by congress for certain river and harbor improvements within the Southern district of Georgia. It will suffice at present to state in general terms that it is alleged that Oberlin M. Carter was a captain in the engineer corps of the United States army; that he was in charge of the improvements; that it was contemplated by the alleged conspirators that competition in bidding for contracts for this government work would be cut off, and that the alleged co-conspirators, or some person or corporation acting for them, would be the only bidders for such work; that this was done secretly for the benefit of the parties indicted; that the contracts would be let at high and exorbitant cost; that Carter should, with fraudulent intent, so draft the specifications for constructing jetty works and training walls as to provide that, in his option, he might require large quantities of material known as the "log and brush mattress" to be paid for by the square yard at a cost comparatively very great, but which, also enabled him to permit the contractor to place in the works the same number of square yards of another specified design of brush mattress, of much less value, at a much cheaper cost to the contractors, but at the same cost to the United States; that the specifications were so devised and drafted that all persons not parties to the said scheme to defraud would be kept in ignorance of this option on the part of the engineer until the bids were in; that other bidders were compelled to put in bids based on the design of mattress of the most expensive and costly construction, while the alleged conspirators would be advised beforehand that if they, or some one of them, were successful bidders, Carter would require to be put in the works mattresses of the cheapest design; that these alleged conspirators were thus enabled to be successful bidders for all of this work at the lowest cost to the contractor and the very highest cost to the United States; that, if there were other successful bidders, Carter, the engineer officer, would require from them the utmost exactitude in the performance of the most expensive contract, but, while passing on the work of the alleged co-conspirators, he would deal most liberally with them; that he would so order and inspect the contracts of his co-conspirators as to insure to them the maximum profit at the least cost and for work and material of inferior value to the government. It is further alleged that this fraudulent scheme was furthered by rejecting on technical grounds other bids, and by enabling the co-conspirators to meet unanticipated competition by second bids on guaranties known to be forgeries; by the fraudulent approval by Carter for payment to the alleged co-conspirators of accounts thus fraudulently made, and as disbursing officer by fraudulently paying to them, or to some person or corporation for them, the amount alleged to be due on such contracts so fraudulently entered into and performed. This being done, it is alleged that the conspirators would divide between them and appropriate to their own use said moneys so fraudulently obtained. It is further charged in the indictment that as the result of this alleged conspiracy, and by means of a number of overt acts, to wit, the presentation for payment of such fraudulent accounts set out therein, the alleged conspirators have defrauded the government in the amount of $700,000.

On arraignment the following defendants, Benjamin D. Greene, John F. Gaynor, William T. Gaynor, and Edward H. Gaynor, presented and filed a plea in abatement. This document consists of nine grounds, constituting one

plea or nine pleas, accordingly as they may be construed. The first ground is that the indictment was found by a body of men purporting to be a grand jury, but which had no legal existence, for the reason that the names of persons placed in the jury box from which the said alleged grand jury was taken were not placed therein by H. H. King, the clerk of this court, and the jury commissioner, nor put in at all alternately as required by law, but that, the said H. H. King, clerk as aforesaid, being accessible, and in no wise disabled or disqualified, the said names were placed in said box by the said jury commissioner and a deputy clerk by the handfuls or bunches, contrary to the statute laws of the United States of America, which required that the clerk should be one of the persons to place the names in the jury box, and that they should be placed therein alternately by the said clerk and the said commissioner; and which tended to the injury and prejudice of these defendants, and of each of them, in that they are entitled by the law of the land to have any charge against them considered by a grand jury selected under the restrictions prescribed by law, and in accordance with the provisions thereof, and in which selection no unauthorized persons shall have or take any part; and this they are ready to verify. A second ground or plea is that the indictment should be quashed because the jury box of the division was not kept, as required by law, continuously in the custody of the clerk of the court, but that during the month of November, 1899, it was delivered by him, or some one connected with his office, and without authority of law, into the hands of strangers in no wise connected with this court, and was carried away from the city of Savannah, where was the office of said clerk, and transported beyond the limits of this division, which gave abundant opportunity to outsiders, who were not under any binding oath or obligation to this court, to violate the sanctity of said jury box. A third ground or plea is that the grand jury was not publicly drawn in the Eastern division, as required by the laws of the United States, and that, not being drawn publicly, these defendants could have no opportunity to challenge said jurors for any cause, or even to know that there was to be a grand jury. A fourth ground or plea is that the indictment should be quashed for that the names of the persons who were drawn as the grand jurors who found the indictment were drawn in the city of Macon, beyond the limits of this division, in a court house other than that of the Eastern division; that no publication of said drawing of the names drawn was made; that no venire facias was issued by the clerk of this court, nor any filed in the clerk's office of the said Eastern division, until after the persons whose names were drawn had been summoned, instructions having been given by those in authority that the marshal and his deputies serving said summons should keep secret the names of such persons so drawn, and should enjoin on each person so summoned the necessity of keeping secret the fact that he had been summoned to serve as a grand juror at said term; so that the choice and selection of such alleged grand jurors were not made public until the court met on December 1, 1899. A fifth ground or plea is that the alleged indictment should be quashed for that there were not, as required by law, 300 names of qualified jurors in the box, and in fact there were less than 200 names of qualified jurors therein on November 22, 1899. A sixth ground or plea is that the indictment should be quashed for that the judge, by an order on November 22, 1899, disqualified as grand jurors all persons whose names might be in the jury box who at that time resided in the counties of Chatham and Glynn, and prescribed in such order that the said grand jury be returned from the counties of the Eastern division other than Chatham and Glynn and thus eliminated from the prospective grand jurors those who were most familiar with public harbor improvements, the necessity therefor, and the cost thereof, and who, from such knowledge, would be in a better position to impartially consider the matters urged against the defendants. A seventh ground of plea or plea is that the indictment should be quashed for the reason that the judge of this court by his order directed that the grand jury be returned from the counties of said Eastern division other than the counties of Chatham and Glynn, and that the grand jury be drawn from the jury box of the Eastern division, before a jury box had been constituted which did not include jurors

from Chatham and Glynn. An eighth ground of plea or plea is that the indictment should be quashed because the judge of this court directed that the grand jury should be returned from the jury box of the Eastern division under the restriction aforesaid, because it appeared to said court that such return of jurors would be most favorable to an impartial trial, and prevent the incurring of unnecessary expense; it being illegal for said judge then and there to pass any such order restricting the drawing of a grand jury to any particular part of said division for any reason, and tended to the injury and prejudice of these defendants. A ninth ground of plea or plea is that the indictment should be quashed for the reason that the judge of this court having, upon the said 22d day of November, 1899. outside the limits of this division, to wit, in the city of Macon, Ga., passed the order before described, did in the city of Macon on said day proceed to draw said grand jury from a box which did not contain the names of grand jurors returned from the counties of said Eastern division other than the counties of Chatham and Glynn, but which only contained, irrespective of said counties of Chatham and Glynn, the names of jurors from the counties of Bryan, Liberty, Ware, Wayne, Pierce, Clinch, Lowndes, Brooks, Thomas, Decatur, Effingham, and Bulloch, there being in said Eastern division, in addition to said counties, the following counties: Appling, Berrien, Camden, Coffee, Charlton, Colquitt, Echols, Emanuel, Irwin, Montgomery, McIntosh, Screven, Tattnall, and Worth, there having been no revision of the jury box, or any return, as contemplated by said order; and that the drawing of said alleged grand jury was illegal, and tended to the prejudice of the defendants, and was further illegal for the reason that the box did not contain names from the counties of McIntosh and Camden, which are the only other counties of this division in which are or might be public harbor improvements, and the citizens whereof would, from their knowledge of such matters, like the citizens of Chatham and Glynn, be best qualified to pass impartially on the charges made against these defendants.

It is averred: That because of the alleged illegal proceedings before mentioned they were not advised in any manner or form that a prosecution of any character or description was impending against them. That they were in the state of New York, in the pursuit of their legitimate business, which at that time required their presence there. That they were not residents of Georgia. That the records of the court show that the bill of indictment was found against them on the 8th of December, 1899, and that a warrant thereupon was issued for the arrest of these defendants; these defendants not having been under arrest or recognizance when said grand jury was empaneled. That so soon as these defendants were advised that such a warrant was in New York for their apprehension, they voluntarily sought out the officer in whose possession they were told it was, and surrendered themselves into his custody. That, having been advised by lawyers skilled in the law that they could not be compelled to go from where they were to the Eastern division of the Southern district of Georgia to answer for any alleged offense said to have been committed therein unless a valid indictment had been preferred against them, and that probable cause of their guilt existed, they, in pursuance of their legal rights and of their constitutional privileges in this respect, demanded an examination into these matters by the constituted authorities having jurisdiction thereof in the state of New York. That the questions involved were considered by a United States commissioner, who decided that these defendants should be remanded to this jurisdiction; but that they, being further advised that said decision was erroneous, and that they were being deprived of their constitutional rights, brought the questions involved to the consideration of the judge of the United States district court for the Southern district of New York, who, after patient consideration, decided that the said commissioner had erred in his decision, and remanded the case to him for further inquiry. That the said commissioner having again reported, adjudging that these defendants should be remanded to the said jurisdiction of the Eastern division of the Southern district of Georgia, these defendants again laid said questions before the said judge of the Southern district of New York, who, having decided against these defend-

ants, they, under legal advice that the decision of said court was erroneous, caused to be brought against the official having them in charge the writ of habeas corpus to inquire into the legality of their detention; the case thereupon arising having been finally disposed of by the supreme court of the United States at its present October term. That on the 12th day of March, 1900, when, as they have since been informed, the case at bar was called in this honorable court, and these defendants then and there summoned to appear and plead, these defendants were in the state of New York, subject to the jurisdiction of the said court for the Southern district of New York in regard to the case at bar, and under a solemn bond and obligation, given on the 20th day of February, 1900, by the terms of which they obligated themselves to personally appear before said district court for the Southern district of New York, or the judge thereof, whenever and as soon as the final order should be entered in the said proceeding, and then and there surrender themselves to the marshal of said district of New York, and abide the order of said district court, or the said district judge, and not depart without leave. That upon the 5th day of March, 1900, and upon the 12th day of March, 1900, and at all intervening times, the said bond and the said obligation to answer to said court, and not to depart without leave, was operative against these defendants. That the February term, 1900, of this honorable court adjourned on the 7th of May, 1900, and that the said bond was operative on that day, and operative on all dates intervening the said 12th day of March, 1900, and said last-named date. That no session of the district court in and for this division was held until the 7th day of January, 1901, and that on said date and on the 9th day of February, 1901, when this court adjourned for the term, and at all intervening dates, these defendants were still under said bond and obligation to appear day by day in the jurisdiction of the district court of New York. That since the session last named of this honorable court there has been no session of this court until January 25, 1902, when the court met for the purpose of sounding the dockets thereof, these defendants then being under bond to appear in this court on this, the 11th day of February, 1902, and were by and with the consent of the district attorney of the Southern district of Georgia, to appear now and here for the purpose of pleading to this indictment. That these defendants, had they been within this jurisdiction at any time from the 22d of November, 1899, until the 8th day of February, 1902, could not have interposed the pleas in abatement to the said alleged indictment on the ground that instructions were given to keep the drawing and summoning of said jury secret, because said facts did not come to the knowledge of the defendants, or either of them, and were therefore not available until the said last-named date: they having the right to assume, if they had ever heard of the drawing of said alleged grand jury, that the same was publicly done. Wherefore they pray judgment on the said alleged indictment, and that the same be quashed.

To this plea the United States attorney for the government filed a special demurrer on grounds which may be sufficiently indicated in the opinion of the court.

See 100 Fed. 941, and 108 Fed. 816.

Marion Erwin, U. S. Atty., and Samuel B. Adams, Sp. Asst. U. S. Atty., for the United States.

Walter G. Charlton, Fleming Du Bignon, Thomas B. Felder, and Daniel W. Rountree, for defendants.

SPEER, District Judge (after stating the facts as above). The defense offered at this period of the case by the persons arraigned is a plea in abatement, which is a dilatory plea. It is an attempt to annul an indictment of the grand jury of a United States court, without any regard to the question of the guilt or innocence of the prisoners or of the public interest at stake. Pleas of this character, where it is not made to appear that any unfair prejudice has been

done to the accused, are regarded with great disfavor. This is made to appear not only by the controlling act of congress on the subject, but by a long and unbroken line of decisions of courts of the highest repute. The act of congress, which is section 1025, Rev. St., provides:

"No indictment found and presented by a grand jury in any district or circuit or other court of the United States shall be deemed insufficient, nor shall the trial, judgment or other proceeding therein be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant."

In the valuable Encyclopædia of Pleading and Practice (volume I, p. 23) the general rule is stated as follows:

"Pleas in abatement, as they do not deny the merits of the plaintiff's claim, but merely tend to delay the remedy, are not favored by the courts, and the greatest strictness is applied to them, and they will not be aided in construction by any intendments. With them correctness of form is matter of substance, and any defect of form is fatal. They must answer the whole case, and contain a full, direct, and positive averment of all material facts."

In the same volume, on page 44, it is declared:

"Such pleas must be certain to every intent, and leave nothing to be drawn by inference. They must anticipate and include all such supposable matter as would, if alleged by the opposite party, defeat the plea."

It is said that the doctrine thus announced with regard to pleas in abatement is but an application of the harsh rules of the common law, and it is contended in the interesting argument of counsel for the accused that the rules of pleading are much more liberal now than they were at common law. This statement is not without an important qualification. The more liberal methods evolved by the advance in modern jurisprudence have been designed to make effective the trial of a case, whether civil or criminal, upon its merits, that the right may in truth be ascertained, that the innocent may be acquitted or the guilty brought to justice. In the case of U. S. v. Terry (decided in the Northern district of California, by Judge Hoffman, in 1889) 39 Fed. 364, the learned judge remarks:

"It may, I think, be justly said that, while the rigorous and apparently harsh, though ancient and well settled, rules of the common law have in some instances been departed from, it has always been in the interest of substantial justice, and to prevent a manifest wrong to the defendant; and conversely where it is plain that substantial justice will not be promoted, nor a manifest wrong to the defendant prevented, the indictment should not be set aside on grounds of technical errors, informalities, or irregularities."

This deliverance of Judge Hoffman related to a plea in abatement where facts contrary to the record were alleged, and not only did the court hold that a demurrer to such a plea cannot be regarded as admitting the truth of such allegations, but it was held that the plea in abatement was bad so far as it contradicted the record. The learned judge continues:

"Assuming, however, that the plea in the case is open to exception as a formal plea in abatement, it does not follow that the defendant is without remedy. Thus, for example, where it is alleged that there has been improper conduct on the part of officers employed in the designating, summoning, and returning of the grand jury, the defendant who may have been

prejudiced thereby may bring the matter before the court by suggestion or motion or affidavit, even where no right of challenge to the array is allowed by law. But this motion is addressed to the discretion of the court, and the court, having general power to preserve the pure administration of justice, will freely exercise its sound discretion for the purpose of serving that end."

A more recent decision upon the same subject and by the supreme court of the United States is Agnew's Case, 165 U. S. 44, 17 Sup. Ct. 238, 41 L. Ed. 627. In that case the plea in abatement was filed because of what seemed at first to be an unusual proceeding in the drawing of the grand jury. Under the practice in the district of Florida it seems that the clerk and marshal draw grand jurors from the jury box. The grand jury was incomplete, and, as stated by the chief justice in his opinion:

"The court ordered a special venire to issue for ten grand jurors to be drawn according to law, 'to be taken from the county of Duval; that the clerk and marshal, in drawing said venire, whenever a name was legally drawn from the box, if said party so drawn was not from the county of Duval, laid aside said name, and continued drawing until ten names from the county of Duval were obtained'; and that, some of the ten returned on the second venire being excused, other names were drawn in the same way, and a third venire was issued, and still another, until the grand jury was completed with grand jurors from Duval county."

It also appeared from the statement of the chief justice that there were orders of court, certified as part of the record, which directed the drawing according to law from the various counties exclusive of Duval county, and then from that county. This, like the order of the court in this case, excluding jurors from the counties of Chatham and Glynn, was done in pursuance of the power given by section 802, Rev. St. Says Chief Justice Fuller, for the court:

"Section 802 of the Revised Statutes was brought forward from a clause of section 29 of the judiciary act of September 24, 1789, which was regarded by Mr. Justice Curtis as applicable to grand as well as petit juries."

It is interesting, then, to reflect that the statute under which the court in this case selected jurors from counties other than Chatham and Glynn was, in substance, enacted by the first congress of the United States, which assembled after the formation of the constitution, received the approval of George Washington, and has been in full force and effect for more than 110 years anterior to the action of the court now under consideration.

The doctrine that for such irregularities as do not prejudice the defendant he has no cause of complaint and can take no exception is expressly reaffirmed in the opinion of Chief Justice Fuller in the case just cited, and the learned chief justice cites in support of his statement a number of authorities from the courts of the states and of the United States. Indeed, the chain of authorities on all of the cardinal principles hereinbefore stated seems to be unbroken, and so clear is this that the efforts and research of counsel in this case have not produced a single decision in which a plea in abatement has been sustained by the United States courts in a criminal case. On the contrary, a multitude of authorities have been cited where such pleas were denied where they did not conform with strict exactness to the requirements of the law, and failed to contain the essential

averments of such dilatory pleading. In U. S. v. Williams, decided in the circuit court for Minnesota, and reported in 12 Myers, Fed. Dec. pars. 1826, 1827, Fed. Cas. No. 16,716, Circuit Judge Dillon, sitting with District Judge Nelson, declared:

"Pleas of this character are dilatory, and, not being favored, the law requires that they shall contain all essential averments, pleaded with strict exactness."

In U. S. v. Hammond, 2 Woods, 197, Fed. Cas. No. 15,294, Circuit Judge Woods held that although, in view of the law at that period of our history, the disqualification of a grand juror was absolute, and did not rest in the discretion of the court, the juror, having been a Confederate soldier, the plea was bad, because it did not state "when and where the juror took up arms and joined the rebellion and insurrection against the United States." In the same case this famous circuit judge, afterwards associate justice of the supreme court, expresses with emphasis the disfavor with which such pleas are regarded, and the exactitude with which every requirement in form as well as substance is insisted upon by the courts. On the latter requirement, see 1 Chit. Pl. *479, *583; 1 Chit. Cr. Law, *448; 1 Enc. Pl. & Prac. p. 27, and authorities cited; 1 Archb. Cr. Pl. *52; 1 Bish. Cr. Proc. par. 435; U. S. v. Richardson (C. C.) 28 Fed. 64. The decision in the last case cited was by Mr. Justice Gray. A very instructive case upon the general topic is U. S. v. Chaires, decided in the Northern district of Florida by Circuit Judge Pardee and District Judge Swayne, reported in 40 Fed. p. 821. The opinion contains this pertinent language:

"The third plea is to the effect that the names of the persons placed by the jury commissioner and the clerk in the box were not drawn from the entire territory within the Northern district of Florida, but were drawn from an alleged division of the district. No injustice or prejudice is averred. Section 802, Rev. St., permits jurors to be returned on an order of court from parts of a district. No injury or prejudice can, therefore, be inferred. We think this plea is bad in form and substance."

In view of principles so clearly announced and so incontrovertibly established by text writers and courts, all of whose conclusions deserve, and some command, obedience, the questions raised by this plea may, we think, be readily determined.

The first ground is that the names of persons placed in the jury box from which the grand jury was taken were not placed therein by H. H. King, clerk of this court, and the jury commissioner, but that, H. H. King being accessible, and in no wise disabled or disqualified, the names were placed in the box by the jury commissioner and a deputy clerk by the handfuls or bunches, and that they should be placed therein alternately by the said clerk and by the said commissioner, and that this tended to the injury and prejudice of these defendants. In passing upon this plea the court will take judicial notice of its own record relative to the duty which it is said the clerk failed to perform. On January 26, 1897, the following order was made:

"In the District Court of the United States for the Eastern Division of the Southern District of Georgia. In re Revision of the Jury List. It appearing to the court that there is a necessity for a revision of the jury of

this court, it is upon consideration ordered that Edward S. Elliott be, and he is hereby, appointed jury commissioner of this court for the Eastern division of the Southern district of Georgia; and it is ordered that the said Edward S. Elliott and H. H. King, clerk of this court, conformably to law, shall proceed as soon as may be to revise the jury list of said court, and for the purpose of convenience and economy in serving said jurors it is ordered that the jurors be selected from the counties of Chatham, Bryan, Liberty, Ware, Glynn, Wayne, Pierce, Clinch, Lowndes, Brooks, Thomas, Decatur, Effingham, and Bulloch."

This order is on the minutes, and is also found attached to the jury list or jury book, as it is indifferently called, which is also of file. Thus, by order, a distinct duty was placed upon the clerk to act with the jury commissioner. The order attached to the jury list which is found of file in the clerk's office sufficiently identifies such list. It is not averred that the names in the jury box did not conform to the names on the jury list or book referred to. It is averred that a deputy clerk placed these names in the jury box. This would not, in my judgment, have been a violation of law, and assuredly would not have disqualified the jurors whose names were placed in the box, provided the clerk was present, took part in the selection of the names, and supervised the manual act of placing the tickets in the box. Whart. Cr. Law, p. 171. While the statute on this subject is apparently mandatory, and while, in my opinion, there is a personal trust imposed by the act of congress upon the individual who is the clerk, yet, in the absence of any charge of bad faith or corrupt motive in the selection of a jury, or other conduct prejudicial to the defendant, if he fails to comply with literal strictness to the provision of the statute, yet does substantially comply, his action will not be regarded as vicious and unlawful. This is especially true where no juror selected is alleged to be disqualified, and no intimation of political or other bias is ascribed to a person or the persons whose names are placed in the box. In the case of U. S. v. Ambrose, 3 Fed. 286,—decision by the circuit court Southern district of Ohio, Circuit Judge Swayne presiding,—the learned judge declared with regard to the manner in which the names of persons shall be placed in the jury box:

"Upon full consideration of the subject I feel bound to hold that this provision of this act of congress was not directory, as I was inclined to think at first; and I think no sound view of the subject will warrant any other conclusion than that that provision is mandatory, and I think it is the duty of every court of the United States to regard it and carry it out; * * * but, on the other hand, * * * that all that is required is an honest intention to conform to the statute, and to carry out its provisions in good faith. Beyond that I think the statute has no efficacy. Beyond that I think it may be held to be merely directory. I think that any irregularity arising from motives other than those of an evil character—any slight irregularity, such as may arise in any case in spite of the greatest care and caution—is not fatal to the indictment."

Upon the same topic it is stated in 12 Enc. Pl. & Prac. p. 277, that:

"The great weight of authority is to the effect that the mere fact that officers intrusted with the several duties prescribed failed to conform precisely to such requirements will not invalidate their action, unless it appears, or may be reasonably inferred from the circumstances, that the complaining party has been prejudiced, or that injury has been sustained by reason of neglect or omissions charged."

In support of this statement of the rule by the Encyclopædia from the supreme appellate courts of 21 states of the Union a large number of authorities are cited. Indeed, the necessity of showing prejudice to invalidate a criminal proceeding is a distinctive feature of the laws both of the state and of the United States. In Doyle v. U. S. (C. C.) 10 Fed. 269, it was held that the irregularity, even, of a judge communicating privately with one of the jurors while they are deliberating on their verdict, furnishes no sufficient ground for reversal, where it is not claimed that it worked of necessity a prejudice to the accused. In the absence of any sufficient showing to the contrary, the presumption is that the jury was selected and drawn according to law. Kie v. U. S. (C. C.) 27 Fed. 351. In the absence of any sufficient showing to the contrary, it is presumed that the clerk did his duty as jury commissioner, and that the other jury commissioner performed his duty also. This is an ancient principle of law, as old as Coke upon Littleton. "Omnia præsumuntur rite et solemniter esse acta." Broom, Leg. Max. Justice Story, in the case of Bank v. Dandridge,. 12 Wheat. 68, 6 L. Ed. 554, declares that the law "presumes that every man in his private and official character does his duty, until the contrary is proved. It will presume that all things are rightly done unless the circumstances of the case overturn this presumption."

Starting, therefore, with the presumption in favor of the regularity of the jury and of the proper performance of duty on the part of the clerk, what is there alleged in this plea to avoid that presumption? Merely this: That Mr. King, the clerk, did not place the names of the jurors in the box, but that they were placed in the box by the jury commissioner and a deputy clerk. The name of the deputy clerk is not mentioned in the plea. It is not alleged that this action of the deputy clerk was not done in the presence of the clerk, nor is it alleged that the deputy was of. the same political party with the jury commissioner, or that any bad or evil purpose moved either one of these parties, or that any incompetent or partial juror was selected. Yet this plea must be certain to every intent, and leave nothing to be drawn by inference. It must anticipate and include all such supposable matter as would, if alleged by the opposite party, defeat the plea. 1 Enc. Pl. & Prac. p. 24, and authorities cited. It is therefore entirely compatible with this plea that every judicial and discretionary function on the part of the clerk as a jury commissioner, all of which is necessarily included in the power to "place in the box," was done, and the plea, while literally true as far as it goes, is bad. It does not negative the presumptions I have mentioned, nor is it averred with that strictness as to essentials under the rules stated which will defeat the solemn indictment of a grand jury. Nor does it matter if the names of the jurors were bunched before they were put in the box, if they were lawfully chosen by the jury commissioners of opposing political faiths, and this it is presumed was done.

The second ground or plea is that the jury box was not kept, as required by law, continuously in the custody of the clerk; that during the month of November, 1899, it was delivered by him, or some

one connected with his office, and without authority of law, into the hands of strangers, which gave opportunity to outsiders to violate the sanctity of said jury box. This is wholly uncertain, and is, besides, contradictory of the well-known proceedings in this case, which are in the knowledge of the presiding judge, and of which he must take judicial notice. It has been the uniform and invariable practice of the judge to lock the jury boxes after drawing a jury, and to seal the same with wax, imprinting his personal seal, and deliver the keys to the marshal and the box to the clerk. Whenever it has been necessary at the official residence of the judge to draw a jury for another division of the district, suitable order is issued to the clerk to transmit the jury boxes by a reliable express company. No safer method of transmission is obtainable. They are received by the officials of the court, receipted for to the express company with the unbroken seal of the court thereon. That was true in the instance referred to in this plea. It is impossible, therefore, that any person could have tampered with the jury box from which these jurors were drawn.

The contention in the third plea, that the grand jury was not publicly drawn, is likewise known to the court to be untrue. This grand jury was publicly drawn in the United States court house in Macon, Ga., in the presence of all the officers who were by law required to be present; and of this fact the court takes judicial notice. It is, indeed, alleged in the fourth ground of the plea that the jurors were drawn in the city of Macon in a court house other than that of the Eastern division. It is said in this plea that no venire facias was issued by the clerk of this court, nor any filed in the clerk's office of the said Eastern division, until after the persons whose names were drawn had been summoned. It does not deny—what the court judicially knows to be true—that a venire facias was issued by the deputy clerk of this court, who has his residence at Macon. It is alleged that instructions had been given by "those in authority" that the marshal and his deputies serving said summons should keep secret the names of such persons so drawn, and should enjoin on each person so summoned the necessity of keeping secret the fact that he had been summoned to serve as a grand juror at said term; but who were "those in authority" who gave such instruction is not alleged, and, since no such instructions were issued by the court, it is wholly unimportant and irrelevant to the validity of the grand jury. Nor were such instructions, if given, in any sense prejudicial to the rights of the defendants.

The fifth ground or plea is that the indictment should be quashed because there were not, as required by law, 300 names of qualified jurors in the box, but in fact that there were less than 200 names of qualified jurors therein, on November 22, 1899. This is also contradictory of the record. There were in the district court jury box at the time of the drawing, as appears by the jury list, 562 names, and in the circuit court box there were 578 names. The order of the court required that the jury should be drawn from the "jury boxes" of the district, and under the act of congress, which authorizes the use interchangeably of district and circuit court jurors when both

courts are in session, although this particular grand jury was drawn from the district court box, all of the names in both boxes may be regarded as the jury body from whom the grand jury was selected. It is said, however, that because the court, by its order, upon repre-sentations made by the district attorney, directed a jury to be drawn from certain counties of the district exclusive of Chatham and Glynn, this disqualified the jurors from those counties, and that their names are to be regarded as taken from the jury box to the injury and prejudice of the defendants, in that there remained less than 300 names in the district court box. The fact, however, that for a particular emergency the court, in the exercise of the power vested in it by section 802, Rev. St., thought proper to draw jurors from particular counties, does not disqualify other jurors, whose names are in the box, who are from other counties. Their names are none the less in the jury box, and must none the less be counted. They are merely not among those jurors from whom the grand jury in a particular case is to be selected. But, even if the order of the court had the effect to disqualify and destroy the juror-acting capacity of jurors from Chatham and Glynn, this could not be prejudicial to the accused. All that they have the right to demand is a grand jury of which every member shall possess the legal qualifications of a juror, and unquestionably such a grand jury could be and was selected from the names remaining in the box after jurors from Chatham and Glynn were eliminated. The requirement as to the number of jurors fixed by the statute is merely to facilitate the convenient selection of an impartial jury. Nor is the court restricted to the use of the jury box designated and provided for by the statute, as, in its discretion, it may hold a stated term of its court in any locality in the district, so, in its discretion, it may draw a jury from the jury box of a state court in any county within its jurisdiction. It would have been competent, therefore, for the court in this case to have drawn this grand jury from the jury box of the state court, to which none of these statutory provisions applied, and might even now, if it thinks proper, order this case to trial at Valdosta, or Thomasville, or any other point in this division of the district, and before a jury not one of whose names may appear on the circuit or district court jury lists of this court.

It is, however, insisted in another ground or plea that jurors from Chatham and Glynn were peculiarly qualified to act in this case because of their familiarity with river and harbor improvements, and it was said, in substance, in argument,—no doubt humorously,—that the jurors who were summoned from the interior counties were so unfamiliar with such matters that they would be startled, and their minds frighted from their propriety, by the bare mention of such sums as it is alleged were fraudulently obtained from the government by the alleged transactions described in the indictment. Such considerations, if justifiable, even, have no weight when contrasted with the motive of the court to obtain a grand jury entirely impartial for the investigation of the tremendous averments of fraud and peculation set forth in this indictment. It was represented to the court by the district attorney that ex-Captain Oberlin M. Carter, charged as

a co-conspirator here, had been tried by court-martial in this county with regard to criminal charges relating to enormous expenditure of government funds in this and in Glynn county. Multitudes of people here heard the testimony delivered on oath; newspapers published in the communities gave graphic accounts of the trial, which itself, conducted with all of the paraphernalia and impressiveness of a military court-martial, had produced a profound effect upon the public mind. Men had taken sides. In view of these facts, partly brought to the attention of the court by the district attorney and partly within the knowledge of the presiding judge, it was determined to choose from that great body of merchants, bankers, manufacturers, and farmers from a number of the law-respecting interior counties of the district a high-minded jury which had neither formed nor expressed an opinion, who were without bias or prejudice, who were perfectly impartial, who would, in the language of their oath, "diligently inquire and true presentment make" as to these momentous issues now before the court. That the court had the right to draw the jury in Macon in open court, although the court was in vacation here, we have no doubt. The jury was drawn there as a matter of course, as has been the practice of the court, whenever necessary, for many years, and no prejudice to the defendants, or either of them, resulted therefrom.

After exhaustive argument by the eminent counsel and careful consideration by the court, I am finally convinced that the pleas are each and all bad. There is pleading defective in substance and in form. This I avoid to discuss further. The pleas set up no violation of any substantial right of these defendants. They do not allege or intimate that there was any unfairness on the part of anybody. They do not specify as an incompetent juror a single man on the grand jury who found this true bill as one not in a position to do them full justice, and who was not in all respects such a man as a grand juror of this court ought to have been. To quash this indictment, in view of the character of this pleading and the character of the indictment against the parties accused, would be, to my mind, abhorrent to the principles of public justice. But, if these pleas were all good in form and substance, they have been waived by these defendants, who, by unnecessarily resisting the processes of the court, and resorting to dilatory expedients of one sort and another, have delayed trial for more than two years, and who, not only refusing to come before the court as they ought to have done, but by exhausting every expedient to prevent the government from bringing them here, now come two years after the indictment was filed, and seek to have it denounced upon technical averments contradicted by the record and the law, but which, if true, would be in no sense prejudicial to them. Said Dr. Wharton, in his well-known work on Criminal Pleading and Practice (paragraph 344), with regard to pleas in abatement to indictments:

"The defendant must take the first opportunity in his power to make the objection. Where he is notified that his case is to be brought before the grand jury, he should proceed at once to take exception to its competency, for, if he lies by until a bill is found, the exception may be too late. But,

where he has had no opportunity of objecting before bill found, then he may take advantage of the objection by motion to quash or by plea in abatement; the latter, in all cases of contested fact, being the proper remedy."

This language is quoted with approval by the supreme court of the United States in a case where the venire issued November 18th, the court opened December 3d, the indictment was returned December 12th, the plea in abatement was filed December 17th, five days later; and that great court held that it was too late. How obvious it is that after two years the defendants are estopped. Subsequently to the decision in the Agnew Case, as late as April 10, 1900, the circuit court of appeals of this (the Fifth) circuit, quoting from the Agnew Case, and reiterating its principle, held that a plea in abatement filed two months after the indictment was too late. These authorities will suffice, but there are many others to the same effect. It is idle to contend that the accused can avoid the legal effect of their conduct on this plea because they were advised by their counsel that they could not be removed here for trial. It is equally futile to contend because they were under bond to appear before the district judge in New York. All the judicial tribunals from the commissioner in New York to the supreme court in Washington have finally adjudicated that the law commanded and compelled their appearance to answer this indictment. To excuse their failure to plead because of their abortive efforts to resist the process of the court would give them an advantage of their own wrong, for in the long interval between the filing of the indictment and the filing of this plea the bar of the statute may have intervened. Any advice to resist the process of this court given by their own counsel in New York is therefore wholly immaterial. And the bond given to the judge in New York had the purpose to make sure not that they should stay there, but that they should come here. If, at any time, they had surrendered to the marshal of this district, or appeared in court, eo instante they and their sureties would, by operation of law, have been exonerated from the obligation of that bond. The long delay in filing this plea is thus clearly seen to be due to their voluntary action, and they cannot now be heard to attack the indictment by this plea, as they might have done had they promptly respected the law, and made their appearance in obedience to its mandate.

For these reasons judgment will be entered overruling the pleas and ordering the defendants to respond to the indictment.