### In re BERWIND-WHITE COAL MIN. CO.

(District Court, E. D. New York. May 12, 1902.)

SHIPPING—INJURY TO STEVEDORE—EVIDENCE OF NEGLIGENCE.

    Claimant's intestate was killed while working for a steamship company as a stevedore in the hold of a barge from which coal was being discharged into a steamship by means of tubs, which, when filled, were hoisted by a derrick. The fall was guided by a guy rope handled by the master of the barge, who took a turn around a pin when a tub was

ready to be hoisted, and held the tub from swinging until after it had cleared the hatchway, when he allowed it to swing over the steamer's chute. At the time of the accident the hold had become dark, and the steamer had not provided lights. The guy man was unable to see when a tub was attached, and failed to take a turn around the pin when one was hoisted, in consequence of which it swung over in the hold, striking and killing the deceased. The question at issue was whether the deceased had given a signal to hoist which the guy man had negligently failed to hear or heed. He testified that he heard no such signal, and but one of the other five men in the hold testified to its having been given. The signal upon which the hoisting engine on the pier was started was given by another man on a platform above the deck of the barge, and his testimony was not taken. *Held*, that such evidence was insufficient to sustain the burden of proof resting on the claimant to show negligence on the part of the master which would render the owner of the barge liable for the death, and that it must be attributed to the failure of the steamship to furnish proper lights.

In Admiralty. Proceeding for limitation of liability. On claim for death of stevedore.

Wilcox & Green, for petitioner.

Richard T. Greene (H. V. M. Dennis, of counsel), for claimant.

THOMAS, District Judge. In the above matter the only liability for which limitation is sought relates to the claim of Mary Madigan, administratrix of the estate of her husband, Patrick Madigan. He was a servant of the Oceanic Steam Navigation Company, which had contracted with the petitioner to supply the former's steamships with coal to be delivered alongside. Pursuant to this contract, certain coal had been carried in the barge Eureka No. 32 to the White Star Pier No. 48, North river, to be discharged into the steamship Oceanic. The barge lay between the steamship and the pier, on which was the engine by which a pulley was operated, whereby tubs were lowered into the hold of the barge, and, upon being filled, raised for discharge into the hold of the steamship. There were three tubs in use, each with a capacity of half a ton, and the intention was that two of them should be in the hold of the barge for the purpose of being filled, while the third was in the course of hoisting, discharging and lowering. The six shovelers, of whom Madigan was one, were in the hold of the barge. When an empty tub descended into the hold, the tackle was unhooked therefrom, and attached to a tub which had been filled by the shovelers. The full tub, upon being hoisted, was raised to an iron chute let into the side of the steamship under the direction of two men who stood on a wooden platform three or four feet wide, extending from the steamship's sides beneath the chute. The barge had a hatch about twelve feet wide, with a space of two feet on deck between the coaming and rail. This brought the extended platform on the steamship directly above the hold of the barge. The master of the barge, an employé of the petitioner, attended the guy. His place on the barge was between the coaming and the rail on the side next to the pier, with his back towards the pier and his face towards the hatch of the barge. The guy rope was attached to a fall about a foot above the hook thereof, and the other end was held by a guy man. The derrick was so arranged that the fall ran at an angle inclining towards

the dock, so that the tendency of the tub when going up or coming down was to swing towards the steamship. To prevent the rising tub from swinging under the deck of the barge as it ascended, and to keep it off from the steamship after it cleared the hatch of the barge, it was the duty of the guy man to take a turn of the guy around the pin, and when the tub had cleared the barge, to slacken the guy so that it would swing sufficiently towards the steamship to reach the platform where the dumpers stood. The turn of the guy about the pin was necessarily made before the tub began to rise, for thereafter the weight of the tub was such that a guy man could not control it. The work had been largely done in daylight, at which time the system of conducting the business was as follows: The engineer on the dock was notified to start his engine by a white object near him moved by a line, which ran to the dumpers' platform, and which one of the dumpers would pull when a loaded tub had been hooked on and was ready to be raised. While the light was sufficient, the dumpers on the platform over the hold of the barge, and the guy man standing close to the coaming, could look down into the hold, and discover the condition of the tubs, and when one was ready to be moved. When the darkness came on, neither the guy man nor the dumpers could see the condition in the hold of the barge, as the hold was without lights; and in practice a shoveler, having made a tub fast to the hook, called out, and thereupon steadied the tub as it ascended. It happened that a loaded tub was hooked to the fall, and was raised before the guy man had taken a turn around the pin, whereupon it swung across the hold of the barge and struck Madigan, causing his death. The claimant insists that when the tub had been made ready the decedent called out "Go ahead!" and that pursuant to such call the fall was raised, and that the guy man was negligent in failing to hear and heed it. The petitioner denies that any such call was made. The claimant also contends that the guy man should have made the turn of the guy around the pin as soon as the tub was lowered, and without waiting for signal, and that in any case the given signal must have been heard by the man on the platform, who gave the signal to the engineer, and that, had the guy man been properly attentive, he would have heard it.

Two questions are presented: First. Should the guy man have made the turn around the pin as soon as the tub descended? Second. Was the call to "go ahead" made, and should the guy man have heard it? It is not understood how the guy could have been turned around the pin, with due reference to the convenience of the work, before the hook was attached to the tub, inasmuch as the tub might be in the center of the hold or at either side. If the tub were in the center, and the guy man could know that fact, then the turn could be taken; but, if the tub were removed to one side, then, if the guy were made fast, it would impede or prevent the attachment of the hook. For instance, in the present case, although the tub in question was in the center of the hold, the decedent was busy with another tub removed to one side. Nor does it appear that it was the custom or practice to secure the guy around the pin before the guy man, by sight or warning, was advised that the moment for raising the tub was at hand. This narrows the inquiry to the question whether the guy man should have known

that the hook was attached, and that the tub was about to be raised. It satisfactorily appears that, owing to the fault of the steamship or its employés, the hold of the barge was not lighted, and that the guy man could not see the conditions in the hold. In fact, it was so dark that the men with difficulty could distinguish each other's forms, and attend to the work before them. The performance of their duties was only possible by their eyes becoming adjusted to the darkness which prevailed. But Burke, one of the six men who were working in the hold of the barge, states that the decedent called out to "go ahead,". and that the tub "started probably in a second or so, and swung right across the boat," so as to come in contact with the decedent, who, according to Burke, was "standing right against the boat's side," facing out towards the hatch where the tub was. Of the six men in the hold Burke is the only one who testified to hearing the call to "go ahead," and although, if such signal were given, the men on the platform should have heard it, no one of them is produced to testify to the fact. Hence, of all the parties connected with the work, no one is produced who pretends to have heard the call except Burke, and the guy man distinctly states that he did not hear it. Therefore the evidence of the guy man is opposed to the evidence of Burke, and certainly the guy man was as satisfactory a witness in his appearance and manner of giving his testimony as was Burke. It must be kept in mind that the burden of proof is upon the claimant, and, with one witness opposed to the other, the claimant should be held not to have fulfilled the burden of proof unless there is some further consideration that should aid her. But the claimant urges that the fact that the engine was started after raising the tub indicates that the engineer received the signal from a man on the platform to raise the tub, and that he would not have done so had he not received a signal from the man in the hold of the vessel to "go ahead." Nevertheless, it may have been the very fault of such man on the platform that the tub was raised without warning, and, as he is absent, no inference would seem to arise that he was acting pursuant to a call. It is true that such man is not presumed to have been negligent, but no more is the guy man presumed to be negligent, nor is there anything to show that he was not attentive to his duty, beyond the fact that he did not hear the call if it was given. But whether it was given is the very fact in issue, and, if the call was given, why did not some one of the other five men—Burke excepted—in the hold hear it? The claimant accounts for this upon the theory that they were engaged in their work, and did not notice it. But it is fair to presume that the fact of the accident would have called their attention to it, so that it would have been remembered, although under other circumstances it might have passed from their memory. The fact is that the men were working in the dark, where those above could not see and those in the hold could see very indistinctly. Pursuing the work under such circumstances was very dangerous, and in the uncertainties attending such condition there should be at least a fair preponderance of evidence that the call was given in such manner that the guy man could have heard it. This is another of many instances where stevedores have been injured while employed in a place dark beyond reasonable probability of safety, and

the blame rests with the person whose duty it was to furnish light, or, in its absence, to guard against accident.

The petitioner may limit its liability, but the claim is disallowed, without costs.