## HAMMERSCHMIDT et al. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. February 21, 1923.)

No. 3585.

**1. Grand jury ☞8—Drawing held to conform to statute.**

Where there were over 700 names in the jury box from which a grand jury was drawn pursuant to Judicial Code, § 276, as amended by Act Feb. 3, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 1253), the fact that they were in packages, corresponding in number to the counties in the district, each package containing the names from a particular county, does not sustain a contention that the drawing was from less than 300 names, where it was made without discrimination from all packages.

**2. Grand jury ☞8—Place of drawing held proper.**

A room which is a part of the clerk's office, situated between his outer office and the courtroom, with doors open giving free access to the public, *held* a proper place for drawing of a grand jury.

**3. Grand jury ☞7—Deputy clerk may act in drawing.**

Under Judicial Code, § 276, as amended by Act Feb. 3, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 1253), a deputy clerk is authorized to act with a commissioner in the drawing of a grand jury.

**4. Conspiracy ☞43(10)—Indictment for conspiracy to prevent registration under Selective Draft Act held "conspiracy to defraud United States."**

An indictment averring that defendants conspired to impair, obstruct, and defeat a lawful function of the government by attempting by promises of moral and financial support to induce persons subject to registry under the Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

1919, §§ 2044a–2044k) to refuse to register and to resist and defy the government, *held* to charge the offense of "conspiracy to defraud the United States," under Criminal Code, § 37 (Comp. St. § 10201).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

**5. Conspiracy ⬳33—Conspiracy to obstruct exercise of lawful function of department is "conspiracy to defraud United States."**

A conspiracy to defraud the United States within Criminal Code, § 37 (Comp. St. § 10201), does not necessarily involve a direct loss to the United States in money or property, but includes a conspiracy to impair, obstruct, or defeat the lawful function of any department of the government.

**6. Conspiracy ⬳33—Artifice and deceit not necessary elements of "conspiracy to defraud."**

Artifice and deceit are not necessarily involved in a conspiracy to defraud the United States.

**7. Conspiracy ⬳43(11)—Indictment held to charge offense.**

An indictment which sets out a circular, large numbers of which are alleged to have been published and distributed by defendants, and which attacks the Selective Service Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k), and directly advises persons coming within its terms to refuse to register for military service, and pledges them moral and financial support in so doing, *held* to charge an offense under Criminal Code, § 37 (Comp. St. § 10201).

**8. Criminal law ⬳622(2)—Granting separate trials to defendants jointly indicted is discretionary.**

Granting of separate trials to persons jointly indicted for conspiracy rests in the sound discretion of the trial court.

**9. Conspiracy ⬳47—Direct proof of unlawful agreement not required; "conspiracy."**

It is sufficient to sustain a conviction for conspiracy, if the evidence shows a concert of action in the accomplishment of the unlawful purpose, or other facts and circumstances from which the natural inference arises that the unlawful overt acts were in furtherance of a common design within the intent and purpose of the alleged conspirators.

**10. Criminal law ⬳1055—Comments of counsel held not ground for reversal, where no exception.**

Comments of the prosecuting attorney on the testimony of counsel for defendants as a witness, where they were stopped by the court in the presence of the jury, and counsel for defendant was permitted to explain his testimony, and to which no exception was taken, *held* not ground for reversal.

Denison, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; Howard C. Hollister and John W. Peck, Judges.

Criminal prosecution by the United States against Thomas Hammerschmidt and others. Judgment of conviction, and defendants bring error. Affirmed.

Certiorari granted 43 Sup. Ct. 521, 67 L. Ed. ——.

Edw. F. Alexander, of Cincinnati, Ohio (Jos. W. Sharts, of Dayton, Ohio, on the brief), for plaintiffs in error.

James R. Clark, Sp. Asst. Atty. Gen. (Thomas H. Morrow, U. S. Atty., of Cincinnati, Ohio, on the brief), for the United States.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DONAHUE, Circuit Judge. The plaintiffs in error were jointly tried and convicted in the United States District Court on an indictment charging an unlawful conspiracy to defraud the United States by impairing, obstructing, and defeating the lawful function of the government of the United States, to wit, the registration for military service of all male persons between the ages of 21 and 30, both inclusive, as provided by the Act of Congress passed May 18, 1917 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 2044a–2044k), by printing or having printed and publishing, displaying, or causing to·be published, displayed, and distributed, in various places and to various per--· sons within the district in which said offense was alleged to have been committed, especially to male persons between the ages of 21 and 30, both inclusive, handbills, circulars, dodgers and other literature composed, printed, intended, and designed for the purpose of counseling, advising, aiding, and procuring said male persons to evade and refuse to obey the requirements of said act of Congress.

The indictment also contains a copy of one of 18,000 circulars, which copy reads as follows:

## DOWN WITH CONSCRIPTION

### The First Amendment to the Constitution.

Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of SPEECH, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

### The 13th Amendment to the Constitution of the United States reads:

"Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States or any places subject to their jurisdiction."

### CONSCRIPTION IS THE WORST FORM OF INVOLUNTARY SERVITUDE

The conscription law which the Wilson administration intends to put into effect proposes that the young men of this nation shall be taken from their homes against their will, and sent to the trenches of France to murder and be murdered in the war over the commercial interests of the capitalist class.

Daniel Webster, one of the greatest American statesman, said this of conscription, in Congress of this county, December 9, 1814:

"Is this consistent with the character of a free government? Is this civil liberty? Is this the real character of our constitution? No, sir, it is not. The constitution is libeled, foully libeled. The people of this country have not established for themselves such a fabric of despotism. They have not purchased at a vast expense of their treasurers and their own blood a Magna Charta to be slaves. Where is it written in the constitution, in what article or section is it contained, that you may take children from their parents......compel them to fight the battles of any war in which the follies or the wickedness of the government may engage? Under what concealment has this power lain hidden which now for the first time comes forth, with a tremendous and baleful aspect to trample down and destroy the dearest right of personal liberty."

Every man who is determined to uphold the "dearest right of personal liberty," every man who refuses to become a victim of the war declared by the government to protect the millions loaned the Allies by the capitalists of this country, should

## REFUSE TO REGISTER FOR CONSCRIPTION

Every Socialist party of Ohio has shown the way in the fight against conscription by adoption of this resolution:

"Resolved, by the Socialist Party in joint meeting assembled, that we denounce the law proposing 'involuntary servitude,' in violation of the thirteenth amendment of the constitution of the United States, in the form of conscription to murder our fellow human beings in other lands, and recommend to and urge all members of the party, and the workers generally that they refuse to register for conscription and pledge to them our financial and moral support in their refusal to become the victims of the ruling class."

One of the millions of leaflets issued by the Socialist Party
SOCIALIST PARTY OF OHIO—1291 Cook Ave., Lakewood, O.

To this indictment the plaintiffs in error filed a plea in abatement, based upon irregularities in the selection of a grand jury.

[1] The evidence offered on the hearing of this plea in abatement tends to prove that at the time the grand jury was drawn the jury box contained more than 700 names, in 18 different packages, each package containing from 40 to 50 names of persons eligible as jurors residing in one of the 18 counties of the district; that the grand jury was drawn without discrimination, from these several packages of names in the jury box by a deputy clerk of the District Court and a jury commissioner of opposite politics, in a room of the clerk's office between the outer office and the courtroom, and the same room in which practically the names of all jurors have usually been drawn.

The fact that the 700 or more names in the jury box were in 18 different packages does not sustain the contention that there were not more than 300 names in the jury box at the time the grand jury was drawn, but, on the contrary, the placing of a like number of names from each county in the district, in separate packages, is in furtherance of the provision of section 277 of the Judicial Code (Comp. St. § 1254) that the jury shall be drawn from different parts of the district, so as to be most favorable to an impartial trial. U. S. v. M. & M. Transportation Co. (C. C.) 187 Fed. 355; U. S. v. Green (D. C.) 113 Fed. 683; U. S. v. Rondeau (C. C.) 16 Fed. 109; U. S. v. Munford (C. C.) 16 Fed. 164.

[2] The evidence further tends to prove that the room in which this jury was drawn is a part of the public office of the clerk of the United States District Court in the Federal Building in Cincinnati, Ohio, to which room the public have access as a matter of right and not as a mere privilege, and that when a jury is being drawn the doors are open and people pass through and at times stop in and watch the drawing. No evidence was offered tending to prove that there was any attempt at secrecy in the drawing of this grand jury, or that there was any fraudulent intent and purpose on the part of the officials drawing the same to prevent the public or any individual member of the public from being present when the drawing was made. Stockslager v. U. S., 116 Fed. 590, 54 C. C. A. 46; U. S. v. Rondeau (C. C.) 16 Fed. 109.

[3] It is further contended that the deputy clerk of court has no authority to act with a jury commissioner of opposite politics in the

drawing of a jury. Section 276 of the Judicial Code, as amended February 3, 1917 (39 Stat. 873 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 1253]), specifically provides that this official duty may be performed either by the clerk of the court or a duly qualified deputy.

[4] It is also insisted that the trial court erred in overruling the demurrer to the indictment. The Act of Congress of May 18, 1917, authorized the President of the United States to increase, temporarily, the military establishment of the United States. In pursuance of the authority conferred by this statute the government required the registration for military service of all male citizens between the ages of 21 and 30, both inclusive. This indictment charges these defendants with a conspiracy to defraud the United States, by impairing, obstructing, and defeating this lawful function of the government of the United States, and avers in clear and unambiguous language the methods and means employed or to be employed by the defendants and the overt acts that had been committed by the defendants in furtherance of the unlawful purposes of the conspiracy charged. So far as appears by this indictment, the persons charged with this conspiracy did not come within the class of persons that were required to register for military purposes, and as such entitled to challenge the constitutionality of the government order in a court of competent jurisdiction. On the contrary, it is averred that in furtherance of the unlawful purpose of the conspiracy charged in the indictment, by impairing, obstructing, and defeating the lawful function of the government, these defendants sought to induce other persons required to register, by promises of moral and financial aid, to resist and defy the United States in the exercise of this governmental function.

[5] A conspiracy to defraud the United States, within the meaning of section 37 of the Criminal Code (Comp. St. § 10201), does not necessarily involve a direct loss to the United States in money or property, but includes a conspiracy to impair, obstruct, or defeat the lawful function of any department of the government. Haas v. Henkel, 216 U. S. 462, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112; U. S. v. Galleanni (D. C.) 245 Fed. 977; Firth v. U. S., 253 Fed. 36, 165 C. C. A. 56; Curley v. U. S., 130 Fed. 1, 64 C. C. A. 369; Sugar v. U. S., 252 Fed. 79, 164 C. C. A. 191; U. S. v. Sacks, 257 U. S. 37, 42 Sup. Ct. 38, 66 L. Ed. 118; U. S. v. Janowitz, 257 U. S. 42, 42 Sup. Ct. 40, 66 L. Ed. 120.

It is claimed on behalf of the plaintiff in error that Haas v. Henkel involved fraud on the part of officials of the government, and that in the case at bar no such question is presented. However that may be, the sufficiency of each of the four indictments in Haas v. Henkel was challenged for the specific reason that "the indictments do not allege an illegal conspiracy to commit any offense against the United States." In support of this proposition counsel for Haas asserted (216 U. S. 466, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112):

"No case has yet applied the statute unless the acts complained of constituted the deprivation of a right or duty imposed on a department of

the goverment by statute or that the acts operated to deprive the government of property or the right of property."

In deciding this proposition and as a direct answer to the argument in the brief of counsel for Haas, the Supreme Court said:

"But it is not essential that such a conspiracy shall contemplate a financial loss, or that one shall result. The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful functions of any department of the government."

This same question is necessarily decided in U. S. v. Sacks and in U. S. v. Janowitz et al., supra.

[6] Nor in our opinion is this broad statement of the law above quoted from the opinion in Haas v. Henkel mere dictum in respect to the implied holding that artifice and deceit are not necessarily involved in a conspiracy of this character. The gist of the conspiracy charged in Haas v. Henkel was not the deception of any one, but, on the contrary, that an associate statistician of the Bureau of Statistics would furnish to his co-conspirators the information to be contained in the cotton crop reports in advance of their official issue.

In the case of Horman v. U. S., 116 Fed. 350, 53 C. C. A. 570, this court held that:

"A scheme or artifice to defraud is not limited in its meaning to such as are to be accomplished by means of deception or trickery."

In Edwards v. U. S., 249 Fed. 686, 161 C. C. A. 596, this court, in discussing the opinion in Horman v. U. S., supra, said:

"In that case the court was holding that the words 'to defraud' may reach an injury by force or intimidation as well as an injury by trickery; but we think there was no purpose to hold that there must necessarily be an intent to get another's money without giving value for it."

[7] Nor is this indictment vague, uncertain, or indefinite in any particular. It clearly and distinctly states the unlawful purpose and object of the conspiracy, and the means by which the alleged conspirators, named in the indictment, sought to accomplish its purpose. So far as these defendants are concerned, there is no possibility of their being twice put in jeopardy for the same offense, regardless of whether others not included in this indictment may or may not be subject to prosecution for participation in the same conspiracy.

The indictment contains a copy of one of the 18,000 circulars actually printed or caused to be printed and distributed or caused to be distributed. For the purposes of this demurrer this copy must be accepted as a true copy of the circular ordered or caused to be printed by two of the defendants, as charged in the indictment, for the purpose of distributing and publishing, or causing the same to be distributed and published, and that were later actually distributed. This circular, in and of itself, evidences not only the intent and purpose of the person or persons responsible for its publication and distribution, but also its potential tendency to accomplish the purpose of the conspiracy charged. It not only attacks the law as the worst form of involuntary servitude, and advises those coming within its terms to refuse to register for military service, but in addition there-

to pledges financial and moral support to all members of the Socialist Party of Ohio and to workers generally who refuse to register as required by this act of Congress and the lawful proclamations and regulations promulgated under its provisions. The demurrer was properly overruled.

[8] The right of persons jointly indicted for conspiracy to a separate trial rests in the sound discretion of the trial court. Heike v. U. S., 227 U. S. 131, 33 Sup. Ct. 226, 57 L. Ed. 450, Ann. Cas. 1914C, 128, and cases there cited. There is nothing in this record tending to prove that the trial court abused its discretion in refusing these defendants separate trials. The claim that the defendants other than Lotta Burke were prejudiced by the refusal to grant them separate trials because the testimony of Lotta Burke is in direct conflict with the testimony of Thos. Foster, who printed the circular, is untenable. Whether Lotta Burke was or was not responsible for having these circulars printed in form and substance as claimed by the government and exhibited in the indictment, when these circulars came into the hands of the other defendants for distribution, they were a finished product and the guilt or innocence of these defendants who distributed them, must be determined by what the circulars then contained and their knowledge or lack of knowledge of their contents.

It is also claimed on behalf of the plaintiffs in error that the verdict of guilty is not sustained by sufficient evidence, and in that connection counsel call attention to the fact that, at the time of this trial, public opinion was so inflamed that it was not necessary for the government to prove the defendants guilty, but rather defendants were compelled to prove their innocence; that the guilt or innocence of the defendants was subordinated to the need of victims with which to fan the flame of war patriotism and to terrorize the supposedly large German population of Cincinnati. This argument, however, overlooks the fact that this cause was not tried until July, 1919, practically eight months after the signing of the Armistice, and long after the conviction of these defendants was necessary, for the purposes of the war, to "fan the flame of war patriotism" or to "terrorize" any one. However high the war feeling may have been at the time this offense was committed, at the time of the trial that feeling had subsided, at least to such an extent that it was negligible; but, even if the case had been tried immediately after the commission of the offense, this court would have no power to determine the weight of the evidence.

Evidence was offered by the government tending to prove every material allegation of this indictment against each and all of these defendants. It is true that there is a substantial conflict in the evidence, but in determining whether the verdict is supported by any substantial evidence the conflict in the evidence is unimportant. A motion to direct a verdict for the defendant concedes, for the purposes of the motion, the truth of the testimony offered on the part of the government and all necessary and natural inferences arising therefrom. The attack made by counsel for plaintiffs in error upon the testimony of the witness Foster is a practical admission that this

court could not find this verdict of guilty not sustained by sufficient evidence, without wholly disregarding his testimony. This applies equally to the other witnesses offered on the part of the government whose testimony relates to material allegations of the indictment.

[9] It is claimed however, that, accepting the testimony offered by the government as true, it fails to establish a conspiracy between these defendants to accomplish the unlawful purpose charged in the indictment. The government is not required to furnish direct proof as to the making and entering into the unlawful agreement. It is sufficient to sustain a verdict of guilty of conspiracy if the evidence shows a concert of action in the accomplishment of the unlawful purpose or proof of other facts and circumstances from which the natural inferences arise that the unlawful overt act or acts were in furtherance of a common design within the intent and purpose of the alleged conspirators. Davidson et al. v. U. S. (C. C. A.) 274 Fed. 285, and cases there cited. Nor is it necessary to establish by the evidence that all the conspirators, at the inception of the conspiracy, met and entered into the unlawful agreement. Conspiracy is a continuous crime. Brown v. Elliott, 225 U. S. 392, 32 Sup. Ct. 812, 56 L. Ed. 1136. If one join a conspiracy after it has been formed, and with knowledge of the facts contributes to the accomplishment of its purpose, he is equally guilty with the original conspirators, although some of the conspirators may be wholly unknown to him. Rudner v. U. S. (C. C. A.) 281 Fed. 516.

[10] It is also claimed that the district attorney was guilty of gross misconduct in accusing defendants' counsel of subornation of perjury in the absence of any evidence tending to establish such charge. One of counsel for defendants, Mr. Alexander, was called as a witness and the district attorney commented severely upon his testimony and his attitude upon the stand. Objections were interposed, and the witness permitted to answer in person the statement made by the district attorney. Later a further objection was interposed to the argument of the district attorney. The objection was sustained, the court saying to counsel in the presence of the jury:

"You have gone too far. * * * There was no evidence at all that Mr. Alexander had coached any of the witnesses. I will let it go at that."

No exceptions were taken to the statement of the court, and no request was made by the defendants for further action or instructions by the court. Nor was any motion made to withdraw a juror, upon the theory that the argument of the district attorney was of such a character as to work a prejudice to the defendants, regardless of the efforts of the court to remove its effect from the minds of the jury.

The court not only sustained these objections and admonished counsel, but it also went to the extent of permitting counsel for defendants, who had testified in the case, to interrupt the argument of the district attorney at the time the objections were made and explain his own testimony to the jury. So far as this record discloses, counsel for defendants were then entirely satisfied with the action

of the court, and permitted the cause to be submitted to the jury without further protest. It would seem unnecessary to say that they cannot now be heard to complain.

A number of other errors are assigned in reference to the admission and rejection of evidence, but it is impracticable and unnecessary to review these in detail. It is sufficient to say that in the opinion of this court no error intervened in the trial of this cause to the prejudice of the defendants in error.

The judgment of the District Court is affirmed.

DENISON, Circuit Judge (dissenting). I think the demurrer to the indictment should have been sustained, and in order that, if review is sought in the Supreme Court, the attention of that court may be directed more expressly to what I think the right view of the statute, I depart from our usual custom of letting dissent go unnoted.

The Selective Service Act, so called (Act May 18, 1917, 40 Stat. 76), and the proclamations pursuant to it required registration on June 6, 1917, of all young men between 21 and 31. The law evidently contemplated a compulsory military service outside the United States. These respondents thought that such requirement was unconstitutional, and that their constitutional right of free speech permitted them to say so. Their ideas were unsound, but it had not then been expressly so decided; and their claims were, in the abstract, at least as plausible as those commonly made that courts may not adjudge any law invalid as unconstitutional, and that an injunction obstructing what defendants think are their constitutional rights need not be obeyed, and such claims are not punished; but the existing state of war made these respondents' concrete conduct disloyal and intolerable. There was no law directly forbidding it (this was before the Espionage Act of June 15, 1917 [40 Stat. 217]), and so they were indicted under section 37 of the Penal Code.

This covers two offenses, conspiracy to commit an offense against the United States, and conspiracy to defraud the United States. They are obviously separate offenses. Refusal to register was an offense under the Selective Service Act; but these respondents were not subject to registration, and were not planning to refuse, but only to get others to do so. Perhaps for this reason it was thought that a charge of conspiracy to commit an offense would not lie; but, whatever the reason, the indictment was solely for conspiracy to defraud the United States. Thus the question is:

"Does one who stands upon his supposed right to refuse to obey an unconstitutional law thereby 'defraud' the United States, if it turns out that the law was valid?

Fraud, in its ordinary and primary sense, involves the thought of artifice, overreaching, or deceit. To defraud another seems at first thought to be to induce his action or conclusion by some kind of direct or indirect misrepresentation. This is Bouvier's definition of fraud. This court led the way in an extension of this strict meaning to a case where the property of another was obtained through a scheme of threats and intimidation. (The blackmail and "black hand" cases

under section 215 [Comp. St. § 10385]. See Horman v. U. S., 116 Fed. 350, 53 C. C. A. 570.) We held that a scheme to deprive another of his property wrongfully, though without using deception or trickery, is a "scheme to defraud." This conclusion was reached largely through a liberality of construction based on the general purpose of that statute (section 215) to protect the mails. On page 354 of 116 Fed., 53 C. C. A. 574, the "lexical meaning" was discussed, to show that no violence was being done to that meaning. The quoted definitions all indicate, not only that one must be deprived of his property or property rights, but that it must be done dishonestly or by taking advantage. Does the burglar "defraud" his victim of the stolen property, or the recalcitrant employee "defraud" the employer of the promised service? The Horman Case does not so teach. Imprisonment is still permitted in civil actions for frauds in many states, but it could hardly be imposed upon the servant who merely ran away.

Another line of cases dissipates the "equally as good" defense, and holds that one who is misled by deception may predicate thereon a charge of fraud, even though he received actual value as great as he parted with or as he was promised, if he did not get what was deceptively held out. The reason is, as we said in Edwards v. U. S., 249 Fed. 686, 689, 161 C. C. A. 596, 599, that fraud lies in "an intent to mislead the owner in any particular that affects his completely intelligent consent."

In Curley v. U. S. (C. C. A. 1) 130 Fed. 1, 64 C. C. A. 369, the conspiracy involved both wrongfully getting a salary out of the United States, and doing so by trickery and deceit. It was not found that the indictment would be good except for its disclosure of one or the other of these elements; indeed Judge Bingham's opinion indicates the necessity of showing one or the other, or both.

I find no authoritative or persuasive opinion (unless the one to be later considered) which permits the conclusion that there was a defrauding in the absence of (1) any deception or misleading or (2) any deprivation of a property right. Usually both are found, but it would seem that one there must be, else the accepted definition fails; but, however compelling these views might be, they must be yielded, if the contrary has been decided by the Supreme Court. This brings us to Haas v. Henkel, 216 U. S. 462, 479, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112. The phrase "impairing, obstructing, or defeating the lawful function of any department of government," quoted from that case by the opinion of this court, is all-inclusive. The departments of government comprise the whole of it, and there is thus no crime or offense which does not impair or obstruct the lawful function of some department. If the phrase reaches what respondents did here, it would have reached as well agitation and persuasion against voluntary enlistment in this war, or against the prosecution of the Mexican or the Spanish War. I cannot think it was intended to have any such far-reaching effect, nor to go beyond what was reasonably pertinent to the issue in the Haas Case. In that case what Holmes and Haas had done was claimed not to have involved the United States in any financial or property loss, and not to have been a statutory offense, and hence

it was argued by counsel (216 U. S. 466, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112) that there was no defrauding. The court overruled both of these contentions, and there was no other (here relevant) controversy in the case. It was not claimed in argument, or suggested in opinion (unless in the quoted phrase) that a conspiracy to defraud which lacked the element of financial loss, did not still necessarily imply some chicanery. The conduct of Holmes and Haas was thoroughly "crooked," and this connotes fraud in the ordinary sense of that word. Holmes was corruptly to betray the confidence of his superiors, and he was to continue to get official information under the implied promise that he would keep it secret, while he was constantly intending not to do so. The moment the conspirators failed longer to deceive and mislead the department as to what was going on, the conspiracy failed. Artifice, concealment of the truth, corruption, were the foundations of the conspiracy. It seems to me that a definition of "to defraud," given in such a case, and which definition (unnecessarily as to that case) omits a commonly accepted element of the offense, should not be taken as a deliberate and authoritative exclusion of that element.[1]

As confirmatory, it will be noted that all the cases cited on page 480 of 216 U. S. (30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112) are only to the point that property loss is not essential. Haas v. Henkel was cited, generally, in U. S. v. Foster, 233 U. S. 515, 526, 34 Sup. Ct. 666, 58 L. Ed. 1074, but the case was one of deception practiced by the postmaster in reporting as stamp sales of his office money which did not honestly belong there, and he thereby fraudulently increased his salary. In U. S. v. Barnow, 239 U. S. 74, 79, 36 Sup. Ct. 19, 60 L. Ed. 155, the entire phrase in question is quoted from Haas v. Henkel, but it is cited only to the point that financial loss is not essential. The offense was a false pretense of official authority. The defense was that the office was nonexistent, and hence there would be no fraudulent assumption thereof. The case does not hold that there can be fraud without deception. In Sacks and Janowitz v. U. S., 257 U. S. 37, 42, 42 Sup. Ct. 38, 40, 66 L. Ed. 118, 120, stamps had been torn from one certificate and put on another. The defense was that it was lawful to do so. When it was once decided that the regulation forbidding transfer was a valid basis for prosecution, it was apparent that to alter an obligation and procure unlawful payment thereof was to defraud the United States, under every definition of fraud.

These are the reasons indicating to me that to disobey the draft law should not be deemed "to defraud the United States."

---

[1] Haas v. Henkel was expressly applied to a case like this by the District Court of Massachusetts (U. S. v. Galleanni [D. C.] 245 Fed. 977), and impliedly by the Fourth Circuit Court of Appeals in Firth v. U. S., 253 Fed. 36, 165 C. C. A. 56. In Sugar v. U. S., 252 Fed. 79, 82, 164 C. C. A. 191, this court seems to have thought that an indictment like this did not charge a conspiracy to defraud, but the point was not controlling, and Haas v. Henkel was not cited.